```
                                                    FILED
                                              U S. DISTRICT COURT
                                              DISTRICT OF MARYLAND

                                              2014 JUL 21  P 1: 30
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MARK J. WILSON, | ) |
| | ) |
| Plaintiff, Pro Se, | ) |
| | ) |
| v. | ) CIVIL NO. PWG 8 14cv2317 |
| | ) |
| CITY OF GAITHERSBURG | ) |
| | ) |
| Defendant | ) |

**Complaint For Employment Discrimination Taken
From EEOC Change No.: 570-2012-00786
Wilson v. the City of Gaithersburg**

1. On Mark Wilson's 54th birthday May 7, 2010 his boss Pete Geiling Director of Facilities and Capital Projects, told him to go to City Hall for a 9:00 meeting with the City Attorney.

2. Wilson had received the day before a letter from the Attorney stating that the City's third party investigator had ruled that Wilson boss's behavior toward Wilson several months ago did not create a hostile work environment, but was characterized as just Geiling's "management style."

3. Wilson thought attorney wished to explain in person her comments.

4. Upon arriving at her office, Wilson was redirected to the Director of Human Resources, where the Director was waiting with Jim Arnoult Director of Public Works.

5. Wilson was surprised not to see the attorney, but was quickly told by Arnoult that his eight year service with the City was over, because Public Works did not need him as a project manager in the

1

Facility Department and would use his wages to create a new position in the Engineering Services Department for a project manager working with storm water infrastructures.

6. There was no offer from Arnoult to Wilson to find another position within the City's workforce or to apply for this new project management position in Engineering Services.

7. To soften the blow, the City offered to continually pay Wilson until the fiscal year ended on June 30, with the agreement that Wilson return to his work space and immediately pack up and leave.

8. A day later Human Resources provided Wilson with a letter that HR Director authored but was signed by Arnoult stating the reasons for the loss of Wilson Project Manager position.

9. Seven months later in December 2010, Wilson happened by chance met a fellow from who worked in the Facilities and Capital Projects Department at a local Taco Bell, who told Wilson of the changes in Wilson's old Department of eight employees.

10. Wilson's boss Pete Geiling was forced to leave in November of 2010, and is working for his brother's plumbing company.

11. The Supervisor for the maintenance workers Sunil Prithviraj, became a Project Manager taking Wilson's position, and the lead maintenance worker, Justine Storm was promoted to Prithviraj's old position, titled "Building & Equipment Maintenance Supervisor."

12. Because the City publishes its annual budgets to the public, and states publicly the staffing titles, number of staff personal per department and pay grades per staffing title, there is a public record of the Facility and Capital Projects Department.

13. The Budget records state that Wilson position was not eliminated after Wilson was terminated in May 2010.

14. The Budget records also state that the new Project Manager position for working with storm water infrastructures did not exist after Wilson's termination and the next year after that.

15. The public budget records pertaining to Facilities and Capital Projects as produced by Arnoult Director of Public Works, are not consist with the statement made in the City's "Position Paper" filed with the EEOC on March 18, 2013, which state that ..."Mr. Wilson's Project Management position was eliminated." and "The cost savings associated with the elimination of Wilson's position allowed the City to create a new Storm Water Management Project Manager position in the Engineering Services Department."

16. The City's position paper does not provide any facts that a new Storm Water Management Project Manager position was ever created especial right after Wilson's termination.

17. The City was inconsistence again where the budget records show that before and after Wilson's elimination the Facility and Capital Projects Department did not lose a position, but maintained its eight employees, while the City's position paper to the EEOC stated a lost of a position, meaning that Department would then have only seven employees not eight as stated in the budget records.

18. Clearly the City had not eliminated Wilson's position. This makes sense because Wilson created the written work scopes and contract documents for repairing and maintenance of the City's 22 buildings that needed contracted work done from time to time. He also worked updated to Pilar data system to projects needed repairs based on the expected life of roofs, HVAC equipment, and other building components. He also checked for errors and omissions to Architect and Engineering drawings and specifications documents. With Wilson gone someone would have to do this considerable necessary work.

19. In the City's "Position Paper" to EEOC they state that "Wilson's primary responsibility as Project Manager was space planning" and there was a lack of work in space planning at this time, although they provide no evidence of the number of hours annually Wilson was directed towards that work by his boss over the five and half years to constitute the label primary responsibility. The facts will show that space planning was a minor responsibility compared to other assignments. The City statement was used as a pretext for terminating Wilson.

20. In the Spring of 2010, Wilson had experience another episode of his boss threatening others and ranting in Wilson presences, which lead to Wilson file a work place compliant.

21. Back in the Winter and Spring of 2009, were several episodes that rattle Wilson, and he confronted his Boss in writing about it, and told him to stop this behavior because it was affecting Wilson's work.

22. One episode between those mentioned above rattled Wilson so much that his Doctor issued a two week medical leave and proscribed medication to restore Wilson's mental health back.

23. While Wilson was gone on medical leave his Boss investigated Wilson's Doctor and discovered he was a psychiatrist. Wilson upon his return found in the office an internet printout description of Dr. Israel's practice.

24. In the City's "Position Paper" the City stated that the City investigator hired by the City wrote that "Wilson never told Mr. Karpinski that he suffered from any type of condition or that he had previously told Mr. Geiling that he did."

25. However, the City through Mr. Karpinski requested that Wilson provide a memorandum on February 25, 2011. On page 3, Wilson stated "I told Pete it was wrong to name call people liars that I work with and it was affecting my working relationship with him and others." With Geiling

4

and Arnault both agreeing that Geiling's behavior toward Wilson was fine in a report. Wilson stated to Karpinski, "I concluded from the above incidence of June 11, 2009, that calling City staff members liars was an acceptable practice by Pete and the City and I must (try) to tolerate it was a condition of continuing employment."

26. Geiling was having difficulty with other people which increased over time, such that seven months after Arnoult terminated Wilson to protect Geiling, Geiling behavior had undermined his own employment and he was asked to resign in November 2010.

27. Wilson who has several disabilities, could not at the time employed, with the City, explain all the medical interactions that caused him to react to his boss's episodes, but Wilson did request that his boss accommodate Wilson by stopping his personal attacks on others in Wilson's presence. However, his Boss failed to do so, and Wilson suffered until Arnault terminated Wilson.

28. Recently, Wilson with the help of health care professionals was able to determined what was happening to himself when Geiling had these episodes. Back in 1992, to treat Wilson's brain that lack enough neurotrasmitters of a normal person that specifically help sustain concentration and limit obsessing Wilson was given the tricyclic antidepressant "Desipramire". Wilson to this day uses Desipramire for his ADHD condition. However, while Desipramire treated one problem it appears to increases Wilson's natural "fight or flight" response to perceived harmful event, attacks or threats to oneself or others by over producing the response chemicals and increase the time recovering from the natural "fight or flight" response. While normal people may react to a perceived threat or attack, they usually recover in minutes or an hour back to their normal activities. Wilson's reactions to Geiling's episodes took several days to recover and in one case two

weeks. Wilson's reactions affected his work and health at home, with sleepless nights and bouts of anxiety and depression.

29. Because, Arnault used several pretexts to explain terminating Wilson's employment, to hide the real reason, which was to protect Arnault's Director of Facilities and Capital Projects, Pete Geiling, from possible future disciplinary action, the City had discriminated against Mark Wilson who complained of Geiling behavior, which was harmful to Wilson in light of a medication used to treat a handicap that Wilson was born with.

Therefore, in the interest of justice Plaintiff moves the Court to render a Judgment to provide for awarding to the Plaintiff damages from the Defendant to the extent that the laws allows and appropriate such that the City does not harm others in the future.

Date: July 21, 2014

_/s/ Mark J. Wilson_

Mark J. Wilson
10540 Smithy Court, North Potomac, Maryland 20878
301-315-6002